## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LATOYA R.,

    **Plaintiff,**

**v.**

**ANDREW SAUL,** *Commissioner,*
*Social Security Administration*,

    **Defendant.**

**CIVIL ACTION FILE**

**NO. 1:19-cv-03938-AJB**

## ORDER AND OPINION[1]

    Plaintiff Latoya R. brought this action pursuant to §§ 205(g) and 1631(c) of

the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial

review of the final decision of the Commissioner of the Social Security

Administration ("the Commissioner") denying her application for social security

disability insurance benefits ("DIB") and supplemental security income benefits

---

[1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 1/24/2020 & 1/27/2020).  Therefore, this Order constitutes a final Order of the Court.

("SSI") under the Social Security Act.[2]  For the reasons set forth below, the Court

**AFFIRMS** the final decision of the Commissioner.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB in or around February 2017, alleging disability commencing on August 9, 2016.[3]  [Record (hereinafter "R") 201-12].   Plaintiff's applications were denied initially and on reconsideration. [R56-57, 82-83].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").    [R138-39].    An  evidentiary  hearing  was  held  on September 11, 2018.  [R33-50].  The ALJ issued a decision on November 5, 2018,

---

[2]      Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq., provides for SSI.   Title II of the Social Security Act provides for DIB. 42 U.S.C. § 401, et seq.   Unlike DIB claims, SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).   Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.   *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).  Therefore, to the extent that the Court cites to DIB cases, statutes, or regulations, they are equally applicable to Plaintiff's SSI claims, and vice versa.

[3]      Plaintiff initially alleged an onset date of January 14, 2017, and subsequently amended it to August 9, 2016.  [R200-12].

denying Plaintiff's application on the ground that she had not been under a "disability" at any time through the date of the decision. [R17-28]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on July 12, 2019, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff then initiated this action on September 3, 2019, seeking review of the Commissioner's decision. [Doc. 1]. The answer, [Doc. 6], and transcript, [Doc. 8], were filed on December 20, 2019. On January 24, 2020, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 10]; on February 26, 2020, the Commissioner filed a response in support of the decision, [Doc. 11]; and on March 4, 2020, Plaintiff filed a reply brief in support of her petition for review of the Commissioner's decision, [Doc. 12]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[4]

---

[4]    Neither party requested oral argument. (*See* Dkt.).

## II.   <u>STANDARD FOR DETERMINING DISABILITY</u>

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228

4

(11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[5] *on other grounds as stated in Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018).  The claimant must prove at step one that he is not undertaking substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of

---

[5]     Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330,  338-39  (S.D.N.Y.  2001);  *Tauber  v.  Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity ("RFC"), age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983),

*superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in*

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## III.   **SCOPE OF JUDICIAL REVIEW**

A limited scope of judicial review applies to a denial of Social Security

benefits by the Commissioner.   Judicial review of the administrative decision

addresses three questions:  (1) whether the proper legal standards were applied;

(2) whether there was substantial evidence to support the findings of fact; and

(3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*,

558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478,

488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the

evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*,

395 F.3d 1206, 1210 (11th Cir. 2005).   If substantial evidence supports the

Commissioner's factual findings and the Commissioner applies the proper legal

standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*,

125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker*

*v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*,

804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*,

703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

IV.   **STATEMENT OF FACTS**[6]

   A.   **Background**

   Plaintiff alleges that she became disabled at age thirty-four due to epilepsy, bipolar disorder, anxiety disorder, headaches, back problems, high blood pressure, and panic disorder.  [R201, 212, 235].  She has a high-school education, two years of college, and past work as a customer-service clerk.  [R47, 236].  Plaintiff alleges in her appeal of the denial of benefits that the ALJ erred in her consideration of Plaintiff's noncompliance with medication, which led her to further err in her consideration of whether Plaintiff's condition met or was equal to the Listing of Impairments for epilepsy.  [Doc. 10 at 9-14].

   B.   **Lay Testimony**

   In a function report dated October 3, 2017, Plaintiff reported that epilepsy and the frequency of her seizures limited her ability to work.  [R253].  She indicated that bright lights, stress, and repeated use of computers were triggers.  [R253].  She reported that she was tired most of the time, took several one-to-two-hour naps throughout the day, and had "extremely little energy."  [R254].  She stated that her

---

   [6]     In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 10, 11, 12; *see also* Doc. 9 (Sched. Ord.) at 3-4 ("The issues before the Court are limited to the issues properly raised in the briefs.")].

seizures were sporadic, that the exact cause was unknown, and that they could be triggered by even small amounts of stress.  [R256-57].  She also indicated that effects of her repeated and frequent seizures included a loss of memory and difficulty staying on track.  [R258].

At the hearing taking place before the ALJ on September 11, 2018, Plaintiff testified that she had been asked to resign from her last job due to too many days off.  [R38-39].  She also indicated that there was a relationship between her seizure activity and her menstrual cycle.  [R39].

Plaintiff testified that she took her medication as prescribed but that she had "some trouble" getting all of her medications due to the fact that she did not have health insurance at the time.  [R39].  She stated that her doctor, Dr. Syed, gave her samples of one of her medications, Vimpat,[7] which would otherwise cost about $900 per month, adding, "He's not able to always provide samples.  So when he runs out, it can be a little difficult to afford that medication.  So sometimes there's a little lull in between me getting it."  [R39-40].  She reported that she had contacted the manufacturer of Vimpat to try to get on some sort of compassionate program

---

[7]     Vimpat (lacosamide) is an anticonvulsant medication used alone and in combination with other medications to control certain types of seizures. MedlinePlus, *Lacosamide*, https://medlineplus.gov/druginfo/meds/a609028.html (last visited 3/21/2021).

but that they only offered coupons for five to ten dollars off. [R40]. She also indicated that because of her lack of health insurance, she had not had an ambulatory EEG[8] that Dr. Syed recommended. [R43].

Plaintiff also testified that she had used marijuana "occasionally" because there were several people on a Facebook epilepsy support group who suggested that it would help reduce the number of seizures she had and because it had helped her with depression in the past. [R40]. She stated, however, that because she had lost her job, it had become unaffordable and was "something that I no longer partake in." [R40-41].

Plaintiff further testified that she had "grand mal" seizures two to three times a month[9] and partial "absence" seizures generally about two to three times a

---

[8]    An electroencephalogram ("EEG") is a test to measure the electrical activity of the brain. An ambulatory EEG will be ordered when it is necessary to monitor brain activity for a longer period. In such case, in addition to the electrodes, the patient will wear or carry a special recorder for up to three days while she goes about her normal routine, or the patient may be asked to stay overnight in a special EEG monitoring unit where brain activity will be continuously monitored. MedlinePlus, *EEG*, https://medlineplus.gov/ency/article/003931.htm (last visited 3/21/2021).

[9]    "Grand mal" seizures are also called generalized tonic-clonic seizures. MedlinePlus, *Generalized      Tonic-Clonic      Seizure*, https://medlineplus.gov/ency/article/000695.htm (last visited 3/21/2021). They involve the whole body and often involve rigid muscles followed by violent muscle contractions and loss of consciousness. *Id*.

11

week.[10]  [R41].  She reported that the grand mal seizures were accompanied by migraine headaches and a great amount of pain in her stomach and back.  [R42]. She indicated that after a seizure, she would spend the rest of the day sleeping, and the effects would carry over through the next day.  [R42-43].

### C.  Medical Records

Plaintiff had her first seizure on January 4, 2015.  [R438, 445].  At the Eastside Medical Center emergency room, she reported that the seizure lasted about two minutes, involved a loss of consciousness and tongue biting, and left her with confusion.  [R438].  A toxicology report was positive for cannabinoids.  [R443]. She was directed to follow up with a neurologist for further workup and an EEG. [R445].

Notes from the Eastside Medical Center emergency room indicate that Plaintiff had a seizure at work June 23, 2015.  [R414].  She had run out of the

---

[10]    "Absence seizure" is the term for a type of seizure involving staring spells and a disturbance of brain function due to abnormal electrical activity in the brain.        MedlinePlus,        *Absence        Seizure*, https://medlineplus.gov/ency/article/000696.htm (last visited 3/21/2021).   This type of seizure usually lasts less than fifteen seconds.  *Id*.

Keppra[11] she had been prescribed and that prior to running out, she had cut her dosage in half due to side effects.  [R414].

Plaintiff returned to the Eastside Medical Center emergency room on February 28, 2016, after having three seizures that day.  [R411].  It was noted that she had not taken her Keppra in three days.  [R411].

Plaintiff was treated at Eastside Behavioral Health Associates on several occasions in 2016.  [R285-312].  At her first appointment, which took place on June 28, 2016, Plaintiff reported that she had been diagnosed as bipolar at age fifteen; was sexually molested at age eight; had made two suicide attempts; and had six miscarriages and two ectopic pregnancies.  [R309].  She reported that she had been working as a customer-service representative for an exterminator company and had suffered fifteen seizures since starting six months earlier because it was so stressful.  [R309].  Her reported medications included Oxtellar XR.[12] [R310].

_____

[11]    Keppra is a brand name for levetiracetam, an anticonvulsant medication typically used to treat certain types of seizures.  MedlinePlus, *Levetiracetam*, https://medlineplus.gov/druginfo/meds/a699059.html (last visited 3/21/2021).

[12]    Oxtellar XR is a brand name for extended-release oxcarbazepine tablets, an anticonvulsant medication used in combination with other medications to control certain types of seizures.  The extended-release tablet is usually taken

At a visit to Eastside Behavioral Health Associates taking place on August 24, 2016, Plaintiff admitted to being noncompliant with her medication, secondary to a seizure, and to being a daily marijuana smoker since age fourteen. [R299-300].  Plaintiff was diagnosed with major depressive disorder, recurrent, severe, without psychotic symptoms; unspecified personality disorder; and cannabis use disorder, moderate.  [R301].

Plaintiff was seen at Eastside Medical Center on September 20, 2016, after she fell in the shower and hit her head.  [R385].  Notes indicate no acute intracranial abnormality, and positional vertigo was suspected.  [R337, 385].

The last reported session at Eastside Behavioral Health Associates took place on October 19, 2016.  [R287].  Plaintiff reported that she had managed to keep her job with neurologist documentation and that she was pursuing a master's degree but that she had to quit secondary to her seizures.  [R287-88].  She continued to report daily marijuana use.  [R287].  Plaintiff was diagnosed with major depressive disorder, recurrent, severe, without psychotic symptoms; unspecified personality disorder; and cannabis use disorder, moderate, dependence.  [R288].

---

once a day on an empty stomach.  MedlinePlus, *Oxcarbazepine*, https://medlineplus.gov/druginfo/meds/a601245.html (last visited 3/21/2021).

On January 23, 2017, Plaintiff came under the care of neurologist Badar H. Syed, M.D., for her seizures.   [R334].   Plaintiff complained that she had experienced an increase in seizures over the past week, including a seizure the night before.  [R334].  Plaintiff reported that she had lost her job and health insurance and that because she could not afford her Oxtellar and Vimpat, she quit using the Oxtellar and was mainly using Vimpat samples.  [R334].  Plaintiff's husband reported that her seizures were better controlled with the combination of Oxtellar and Vimpat but that she was on the combination for only about a month; that she had two generalized tonic-clonic seizures in her sleep during the past weekend; and that she was averaging four to five generalized tonic-clonic seizures per month.  [R334].  Plaintiff also reported that she missed an ambulatory EEG appointment because she slept through it.  [R334, 336].

Dr. Syed assessed intractable complex partial seizure with or without secondary generalization.  [R335].  He noted that since Plaintiff had lost her health insurance, she had not been able to continue her Oxtellar and Vimpat combination regimen; that while she had been on the combination for just a few weeks, it did help her seizures; and that Keppra caused her dizziness and mild behavioral side effects.  [R335].  He further noted that Plaintiff had two nocturnal generalized tonic-clonic seizures over past two weekends and was averaging four to five

generalized tonic-clonic seizures per month.  [R335].  Dr. Syed gave Plaintiff "a bunch" of Vimpat samples and recommended that she contact UCB Pharma to obtain free Vimpat on compassionate grounds; discontinued Oxtellar "due to financial reasons"; ordered oxcarbazepine[13]; and ordered an ambulatory EEG to be completed "down the road once the health insurance is reinstated."  [R335].

On June 20, 2017, Arthur Schiff, M.D., reviewed Plaintiff's medical record and opined that she did not have any exertional limitations but that she should avoid all exposure to hazards.  [R77-78].  Dr. Schiff additionally opined that listing-level severity had not been established.  [R78].

Plaintiff was again treated at the Eastside Medical Center emergency room on June 24, 2017, with complaints of seizures and back pain.  [R366, 475-81].  She reported that she had two seizures that day and that that her pain began after the second seizure.  [R475].  It was noted that she had run out of medication two days earlier.  [R366, 475].

A psychological consultative examination was conducted on July 6, 2017, by Scott Duncan, Ph. D.  [R315-18].  Plaintiff reported that she had not felt the

---

[13]     Immediate-release oxcarbazepine tablets are usually taken every twelve hours, with or without food.  MedlinePlus, *Oxcarbazepine*, https://medlineplus.gov/druginfo/meds/a601245.html (last visited 3/21/2021).

need to seek formal mental-health treatment in the last six months; that she was not taking any mental-health medications; that she smoked marijuana daily; and that she was limited only by her physical health issues and frequent seizures.  [R316]. The only diagnoses given were mild cannabis-use disorder; self-reported physical issues; and the psychosocial and environmental problem of lack of full-time employment.  [R318].

Plaintiff returned to Dr. Syed on July 24, 2017, with complaints of weight loss, blurred vision, vertigo/dizziness, ringing in her ears, and back pain. [R331, 484].  She reported that she had four to five grand mal seizures since her last office visit and that she ended up going to Eastside Medical Clinic because a seizure caused her to fall and hurt her back.  [R484].  Plaintiff told Dr. Syed that her seizures were better, with one seizure during the week of her menstrual cycle, and that her seizures were "under control" unless she missed her medication for financial reasons.  [R484].  It was noted that Plaintiff had been approved for free Vimpat through UCB; that she had a breakthrough seizure on July 4 because she ran out of oxcarbazepine due to financial reasons; and that she had failed to increase her Vimpat as she had been instructed during a visit taking place on April 24, 2017. [R484-85].  Dr. Syed continued oxcarbazepine and Vimpat; again directed Plaintiff

to increase the Vimpat; and gave Plaintiff "a bunch" of samples of Oxtellar and Vimpat.  [R485].

A head CT was taken at Eastside's main campus on September 17, 2017, because of a history of headache and vomiting.  [R353].  Results were normal. [R353].

Plaintiff was seen in the Eastside Emergency Room on September 24, 2017, for "trauma."  [R354].  Imaging of her lumbar spine was normal.  [R354].

Dr. Emerson Ham, M.D., reviewed Plaintiff's medical record on December 7, 2017, and concluded that she retained a medium exertional level, with additional postural and environmental limitations.  [R93-96].  He also opined that listing-level severity had not been established.  [R95].

At an appointment with Dr. Syed taking place on February 1, 2018, Plaintiff repeated her report of one-to-two generalized tonic-clonic seizures per month, which usually took place during the week of her menstrual cycle.  [R465-66].  She also reported "spacing out," in the sense of losing track of time while talking on the phone or watching television, once or twice per day.  [R465].  Plaintiff's examination was essentially normal, including a benign gait.  [R465]. It was noted that Plaintiff had been unable to increase Vimpat as directed due to dizziness and that she continued to take oxcarbazepine.  [R465].  Dr. Syed directed Plaintiff to

18

split the Vimpat into morning and evening doses; started topiramate[14]; continued

oxcarbazepine; and gave Plaintiff a requisition for a blood test, as she was overdue.

[R466].

Plaintiff returned to Dr. Syed on April 30, 2018, for follow-up.  [R457].  She

reported that she forgot to pick up the prescription for topiramate, that she was not

splitting her Vimpat doses, and that she had not gone for blood tests, as discussed

during the last visit.  [R457-58].  She also stated that she had not had a generalized

tonic-clonic seizure for thirty-five days after the last visit but that she then started

having seizures after her dog died.  [R457].

### D.   Vocational-Expert Testimony

At the hearing before the ALJ, a vocational expert ("VE") testified that

Plaintiff had past work as a customer-service clerk.  [R47].  When asked about the

vocational capabilities of a hypothetical person of Plaintiff's age, education, and

work history, who was limited to medium work and could not climb ladders, ropes,

or scaffolding, may only frequently kneel, crouch, crawl, balance, stoop, or climb

---

[14]     Topiramate is an anticonvulsant medication that is used to treat certain types of seizures, including grand mal seizures and partial onset seizures. Topiramate is also used to prevent migraine headaches but not to relieve the pain of migraine headaches when they occur.   MedlinePlus, *Topiramate*, https://medlineplus.gov/druginfo/meds/a697012.html (last visited 3/21/2021).

ramps or stairs, and must avoid all exposure to hazards, the VE testified that the person could perform Plaintiff's past relevant work as a customer-service clerk and that the person could perform other work that exists in significant numbers in the national economy, such as the jobs of grocery bagger, hand packager, and dining room attendant.  [R47-48].

## V.    ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.  The claimant has not engaged in substantial gainful activity since August 9, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

. . .

3.  The claimant has the following severe impairment: obesity and seizure disorder (20 CFR 404.1520(c) and 416.920(c)).

. . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and

416.967(c) except that she must avoid climbing ladders, ropes or scaffolding. The claimant is limited to no more than frequent climbing of ramps and stairs, kneeling, crouching, crawling, balancing or stooping. She should avoid all exposure to hazards.

. . .

6.   The claimant is capable of performing past relevant work as a customer service clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

. . .

7.   The claimant has not been under a disability, as defined in the Social Security Act, from August 9, 2016, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

[R19-28].

With regard to Plaintiff's epilepsy, the ALJ explained that Plaintiff's seizure disorder did not meet the requirements of Listing 11.02, "as convulsive epilepsy does not occur at least once a month in spite of three months treatment."  [R22]. The ALJ then explained that "progress notes show that [Plaintiff was] consistently non-compliant with medication":  a treatment note from January 23, 2017, indicated that Plaintiff had been prescribed Oxtellar and Vimpat and that Plaintiff's husband reported that seizures were better controlled when she took the combination of medication but that Plaintiff lost her insurance and mainly used Vimpat samples; in June 2017, Plaintiff complained of having two seizures but

indicated that she had been out of medication for two days; and in July 2017, Plaintiff reported having a breakthrough seizure when she ran out of oxcarbazepine. [R22]. The ALJ noted that Plaintiff indicated that she had some difficulty getting medication because she lacked health insurance and her doctor did not always have samples available; that she had been given a medication discount card; and that she occasionally used marijuana because it had been suggested to her by an epilepsy group. [R23, 40]. The ALJ further observed that treatment notes indicated that Plaintiff smoked marijuana daily at least through July 2017 and had an arrest for possession; that she missed an ambulatory EEG appointment because she slept through it; that Plaintiff did not start topiramate, split Vimpat, or timely get blood work as directed in early 2018; and that in early 2018, she had gone thirty-five days without a grand mal seizure and had been having her "usual" catamenial seizure during her menstrual cycle. [R20, 23-24]. The ALJ then went on to explain that she found Plaintiff's statements regarding her condition to be less than fully credible because she had failed to undergo recommended testing; intracranial imaging was normal; the record showed that Plaintiff's seizures were under control unless she missed her medication, yet she was repeatedly noncompliant with medication and recommended dosages; and the record did not reflect any follow-up

regarding the correlation between Plaintiff's menstrual cycle and seizure activity. [R25].

## VI.    **CLAIMS OF ERROR**

Plaintiff alleges that the ALJ improperly held Plaintiff's noncompliance with medication against her, which caused the ALJ to erroneously conclude that Plaintiff's condition was not equal to the Listing of Impairments for epilepsy, specifically Listings 11.02(A) and (B). [15]  [Doc. 10 at 9-14 (referring to 20 C.F.R. pt. 404, subpt. P., app. 1, § 11.02(A), (B))].

The Listing of Impairments in Appendix 1 of Subpart P of Part 404 of Title 20 of the Code of Federal Regulations describes for each of the major body systems impairments that are considered to be severe enough to render an individual disabled. 20 C.F.R. §§ 404.1525(a), 416.925(a). As noted above, at the third step of the five-step disability evaluation process, the ALJ must determine whether a claimant's impairments meet or equal one of the Listings and meet the duration requirement. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see*

---

[15]    Plaintiff does not allege any other errors and thus has waived any other challenges she might have asserted. *See Sanchez v. Comm'r of Soc. Sec.*, 507 Fed. Appx. 855, 856 n.1 (11th Cir. Feb. 8, 2013) (per curiam) (holding that claimant waived certain arguments by not expressly challenging the ALJ's findings).

*supra* Part II.   If a claimant meets or equals a Listing, then she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

A claimant meets a Listing if she has a diagnosis included in the Listings and provides medical reports documenting that her conditions meet the specific criteria in the Listings.   *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (per curiam) (citing 20 C.F.R. § 404.1525(a)-(d)).   A claimant equals a Listing if the medical findings show an impairment at least equal in severity and duration to the criteria set out in the Listing most like the claimant's impairment.   *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. § 416.926(a)); *Wilson*, 284 F.3d at 1224 (citing 20 C.F.R. § 404.1526(a)).

Within the context of the Social Security regulations, "epilepsy" is defined as "a pattern of recurrent and unprovoked seizures that are manifestations of abnormal electrical activity in the brain."[16]   20 C.F.R. pt. 404, subpt. P., app. 1, § 11.00(H)(1), 81 Fed. Reg. at 43054.   Under Listing 11.02, "the degree of impairment is determined by considering the type, frequency, and duration of the

---

[16]     For the purposes of this Order, the Court refers to the Listings effective at the time Plaintiff filed her applications for benefits. *See Rev. Med. Criteria for Evaluating Neurological Disorders*, 81 Fed. Reg. 43,048, 2016 WL 3551949 (July 1, 2016) (rule effective September 29, 2016); *see also Rev. Med. Criteria for Evaluating Neurological Disorders; Correction*, 82 Fed. Reg. 39,664, 2017 WL 3589390 (Aug. 22, 2017) (correcting inadvertently omitted reference).

claimant's seizures." *Bellew v. Acting Comm'r of Soc. Sec.*, 605 Fed. Appx. 917, 920 (11th Cir. May 6, 2015) (citing 20 C.F.R. pt. 404, subpt. P., app. 1, § 11.00(A)). Listing 11.02(A) requires proof of "[g]eneralized tonic-clonic seizures[17] . . . , occurring at least once a month for at least 3 consecutive months." 20 C.F.R. pt. 404, subpt. P., app. 1, § 11.02(A), 81 Fed. Reg. at 43056. Listing 11.02(B) requires proof of "dyscognitive seizures[18] . . . , occurring at least once a week for at least 3 consecutive months." *Id*. § 11.02(B), 81 Fed. Reg. at 43056. Only generalized tonic-clonic seizures and dyscognitive seizures are counted under § 11.02.[19] *Id*. § 11.00 (H)(4)(e), 81 Fed. Reg. at 43054.

---

[17]     The Social Security regulations state that "generalized tonic-clonic seizures" are characterized by loss of consciousness accompanied by sudden muscle tensing causing the person to lose postural control, followed by convulsions. 20 C.F.R. pt. 404, subpt. P., app. 1, § 11.00(H)(1)(a), 81 Fed. Reg. at 43054. "Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." *Id*.

[18]     According to the regulations, "dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control." 20 C.F.R. pt. 404, subpt. P., app. 1, § 11.00(H)(1)(b), 81 Fed. Reg. at 43054. Blank staring, change of facial expression, and automatisms such as lip smacking, chewing, swallowing, gestures, or verbal utterances, may occur during the seizure. *Id*. A dyscognitive seizure may also progress into a generalized tonic-clonic seizure. *Id*.

[19]     Other types of seizures are evaluated under the Listings for Mental Disorders, § 12.00. 20 C.F.R. pt. 404, subpt. P., app. 1, § 11.00(H)(4)(e), 81 Fed. Reg. at 43054.

Under both subsections (A) and (B), the claimant must present documentation containing at least one detailed description of her typical seizures by someone who has observed them, preferably a medical professional. *Id*. § 11.00(H)(2), 81 Fed. Reg. at 43054.  If the claimant experiences more than one type of seizure, a description of each type is necessary.  *Id*. § 11.00(H)(2), 81 Fed. Reg. at 43054.  The claimant must also show that the symptoms persist "despite adherence to prescribed treatment," *id*. §§ 11.00(C), (H)(4), 11.02(A), (B), 81 Fed. Reg. at 43052, 43054, 43056, although noncompliance may be excused for "good reason," such as when treatment is very risky due to its consequences or unusual nature or the claimant is "unable to afford prescribed treatment [she is] willing to accept, but for which no free community resources are available," *id*. § 11.00(H)(4)(d), 81 Fed. Reg. at 43054 (further providing that the Commissioner will follow 20 C.F.R. §§ 404.1530(c) and 416.930(c) when determining whether a claimant has good reason for failing to adhere to prescribed treatment).

In her allegations of error, Plaintiff contends that in her decision, "the ALJ [did] not dispute the frequency of [Plaintiff's] seizures" but that she then improperly determined that the § 11.02 criteria were not met because Plaintiff was "consistently non-compliant with medication."  [Doc. 10 at 10 (citing [R22])].

26

Plaintiff concedes that the ALJ acknowledged that Plaintiff's testimony that her lack of health insurance made it difficult for her to obtain her medications and that her doctor did not always have samples available, [*id.* at 10, 14 (citing [R22, 23])], but she argues that it was the Commissioner's burden to show that Plaintiff's poverty did not justify her noncompliance, [*id.* at 13 (citing *Dawkins v. Bowen*, 848 F.2d 1211, 1214 n.8 (11th Cir. 1988))]; that the ALJ's decision does not determine whether Plaintiff simply could not afford her medications, despite receiving some samples and what Plaintiff characterizes as a "pitiful" manufacturer's discount, [Doc. 10 at 7, 14 (citing [R40, 206])]; and thus that the Commissioner failed to meet the Agency's burden.

In response, the Commissioner argues that the ALJ did not conclude that Plaintiff was not disabled based on noncompliance with prescribed treatment and that she instead properly found that Plaintiff's testimony that her poverty caused her to be unable to afford her prescriptions was not credible and thus that Plaintiff was unable to satisfy Listing 11.02. [Doc. 11 at 14 (citing *Mack v. Comm'r of Soc. Sec.*, 420 Fed. Appx. 881, 882-83 (11th Cir. Mar. 22, 2011); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003))]. Specifically, the Commissioner contends that Plaintiff failed to demonstrate that she had convulsive episodes at the frequency required by Listing 11.02 when she was compliant with medication; that

substantial evidence, including evidence of daily marijuana use and repeated compliance failures unrelated to finances, supports the ALJ's determination that Plaintiff's noncompliance with medication was not excusable; and that Plaintiff therefore has failed to establish reversible error.  [*Id*. at 6-15 (citing [R22, 25, 38-42, 95, 334, 336, 457, 475-81, 484])].  The Commissioner additionally argues that Plaintiff challenged only the ALJ's step-three finding and thus has failed to prove that she had limitations in excess of the RFC or that she could not perform the jobs identified by the vocational expert.  [*Id*. at 14-15 & n.5].

In reply, Plaintiff contends that the Commissioner's compliance argument misses the point:  if Plaintiff cannot afford medication, she cannot be faulted for the fact that there was no consistently medicated period during which to observe the frequency of her seizures.  [Doc. 12 at 1-2].  She also argues that the record shows that she was not willfully noncompliant, based on her testimony that the medication cost approximately $900 per month, that the discounts only amounted to $5 to $10, and that her neurologist did not always have samples available. [*Id*. at 2 (citing [R40])].  She further contends that the Commissioner's argument that her marijuana use belies her poverty claims is an impermissible post-hoc rationalization, is based on facts not in evidence, and disregards Plaintiff's hearing testimony that she no longer used it.  [Doc. 12 at 2 (citing [R40])].

After careful consideration of the arguments, the record, and the ALJ's decision, the Court finds no reversible error. As an initial matter, the Court finds lacking from Plaintiff's argument any showing that she has presented or can present required evidence that her seizures were of the nature required under Listing 11.02, regardless of whether she should be excused for her noncompliance with medication. Because a claimant is conclusively presumed to be disabled if she satisfies a Listing, [20] her evidentiary burden is heavy: where a claimant alleges that

---

[20]     For this reason, even if the Commissioner is correct in arguing that the ALJ properly found that Plaintiff failed to prove that she had limitations in excess of the RFC or that she could not perform the jobs identified by the vocational expert, such findings would not render a step-three error harmless. *See Albra v. Acting Comm'r of Soc. Sec.*, 825 Fed. Appx. 704, 709 (11th Cir. Sept. 8, 2020) (declining to determine whether a step-five error was harmless because the ALJ had reversibly erred at step three); *Nichols v. Colvin*, No. 1:14CV536, 2015 WL 4656484, at *8 (M.D.N.C. Aug. 5, 2015) ("The mere fact that an ALJ properly found a claimant capable of past work at step four or of other work at step five does not render an error at step three harmless."); *Vest v. Colvin*, No. 5:13CV00067, 2014 WL 4656207, at *27 (W.D. Va. Sept. 16, 2014) (same); *Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439, at *6 (N.D. Ohio July 18, 2013) (explaining that failure to provide analysis of the plaintiff's fibromyalgia at step three was not harmless error "because the Social Security regulations state that if a person's impairments meet or equal a Listing, she is disabled . . . and would be entitled to benefits with no further analysis required"); *Mulvenna v. Sullivan*, 796 F. Supp. 325, 335 (N.D. Ill. 1992) (explaining that step-five analysis could only render a step-three error harmless "if that analysis actually covered the bases that would have been required at step 3"); *but see Yost v. Astrue*, No. 11 C 1423, 2012 WL 2814373, at *12 n.9 (N.D. Ill. July 10, 2012) (stating in dicta that "any error at Step 3 would have been harmless since the ALJ continued on in the

she has an impairment that meets or equals a Listing, she must present specific medical findings showing how her impairment meets or equals each of the Listing's requirements.   *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (per curiam); *Bell v. Bowen*, 796 F.2d 1350, 1353 (11th Cir. 1986).   Despite this heavy burden, Plaintiff has not pointed to documentation containing at least one detailed description of her typical seizures by someone who has observed them, as required under § 11.00(H)(2), [*see generally* Docs. 10, 12], and thus has not provided evidence sufficient under the regulations to establish that her seizures are the generalized tonic-clonic seizures or dyscognitive seizures addressed in Listings 11.02(A) and (B), *see* 20 C.F.R. pt. 404, subpt. P., app. 1, § 11.00 (H)(4)(e), 81 Fed. Reg. at 43054. While the ALJ may not have disputed the frequency of the seizures, [*see* Doc. 10 at 10 (citing [R22])], this hardly establishes that the ALJ found that Plaintiff's seizures were of the type and frequency required under Listing 11.02(A) or (B), as Plaintiff contends, or that the record contains the detailed descriptions of Plaintiff's seizures that would have enabled her to do so.   *See O'Neal v. Comm'r of Soc. Sec.*, 614 Fed. Appx. 456, 459 (11th Cir. June 10, 2015) (finding no reversible error

---

sequential analysis and his finding at Step[] 5 is sufficient to substantiate his determination that Plaintiff is not disabled").

where the plaintiff failed to establish that he met the requirements found in the diagnostic description in the relevant Listing's introductory paragraph); *Bellew*, 605 Fed. Appx. at 922 (finding no reversible error where no opinion from an acceptable medical source established that the claimant's impairments were equivalent in severity to the Listings at issue).  Consequently, even if the Court were to find that the ALJ erred in her consideration of Plaintiff's noncompliance with medication, there is no basis for finding that § 11.00(H)(2) was satisfied and thus that Plaintiff could have shown that her condition met or was equal to Listing 11.02(A) or (B).  It therefore appears that any error the ALJ might have made in considering Plaintiff's noncompliance with medication in her Listings analysis would be harmless.

Moreover, the undersigned finds that the ALJ did not err in her analysis of Plaintiff's noncompliance.  To Plaintiff's point, it is true that "when an ALJ relies on noncompliance as the sole ground for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment."  *Ellison*, 355 F.3d at 1275; *accord Mack*, 420 Fed. Appx. at 882-83; *Dawkins*, 848 F.2d at 1213-14 & n.8.  It is also true that the ALJ did not make an express finding that Plaintiff was able to afford

treatment.   [*See generally* R17-28].   Be that as it may, the decision makes abundantly clear that the ALJ considered Plaintiff's allegations that poverty prevented her from taking her medication as prescribed and determined that Plaintiff was in fact able to afford her medication:  the ALJ noted that Plaintiff had lost her insurance, that she mainly used Vimpat samples, and that her doctor did not always have samples available, but that the medication manufacturer had given Plaintiff a discount card and that Plaintiff also used marijuana.  [R22-23].  The record bears this out:  at the hearing before the ALJ, Plaintiff testified that it was Vimpat that she had difficulty getting, [R40], yet Dr. Syed's records show that Plaintiff had been approved for free Vimpat through UCB by July 24, 2017, [R484], and while Plaintiff was reporting to Dr. Syed that she was running out of medication due to poverty, [R334-35 (1/23/2017); R336, 475 (6/24/2017); R484 (7/24/2017)], she was at the same time also reporting daily marijuana use, [R299-300 (8/24/2016); R287 (10/19/2016); R316 (7/6/2017)].  The ALJ also noted a number of compliance issues that had nothing to do with poverty:  Plaintiff missed an EEG appointment because she slept through it, [R23, 334, 336], and in early 2018, she failed to follow her physician's recommendations to start topiramate, split Vimpat, and timely get blood work as directed in early 2018, [R24, 457-58].  The record also shows that Plaintiff was repeatedly noncompliant

with Keppra before she lost her job and her insurance. [R411, 414]. For these reasons, the undersigned concludes that the ALJ did not err in finding that Plaintiff's noncompliance with treatment was not excused by poverty.

## VII.  <u>CONCLUSION</u>

In conclusion, the Court **AFFIRMS** the final decision of the Commissioner.

The Clerk is **DIRECTED** to enter final judgment in favor of the Commissioner.

**IT IS SO ORDERED and DIRECTED**, this 22nd day of March, 2021.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE